IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>MICRO FOCUS (U.S.), INC.,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td></td><td>Civil Action No. PX-16-0971</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>EXPRESS SCRIPTS, INC.,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Defendant.</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

******

**MEMORANDUM OPINION**

Pending before the Court in this contract action are cross-motions for summary judgment. ECF Nos. 174, 186. The parties appeared before the Court for a hearing on February 5, 2019. Based upon the parties' briefs, arguments, and the record evidence, the Court grants in part and denies in part both motions.

I.      **Background**

This case stems from a software use dispute. Plaintiff Micro Focus ("Micro") owns and licenses "terminal emulation" software, which permits users to access host systems from personal computing devices. ECF No. 174-1 at 5 (Ford Dep.). Micro licensed two terminal emulation products, Rumba and OnWeb Web-to-Host (collectively, "Rumba software"),[1] to Defendant Express Scripts ("Express"). Micro provides software to customers under a perpetual license, subject to agreed-upon terms. ECF No. 186-4 at 6-7 (Ford Dep.). Micro also offers technical support for a separate fee, generally paid each year as an annual maintenance renewal. *Id.*

---

[1] Rumba and OnWeb Web-to-Host perform similar functions but differ in their method of activation. ECF No. 174-1 at 8-10 (Ford Dep.). "Rumba software" is a term that refers both to Rumba and OnWeb Web-to-Host software. ECF No. 186-6 at 17 (Miller Dep.).

Express, a pharmacy benefits manager, licenses Rumba software that it uses to connect to the mainframe where it stores patient information, prescription history, and other data. ECF No. 174-2 at 6-10 (Mudhenk Dep.). Rumba offers a functionality "[s]imilar to a web browser," ECF No. 174-3 at 7 (Said Depo), in which an Express employee clicks a Rumba icon on his or her personal device to connect to the mainframe. ECF No. 174-2 at 11 (Mudhenk Dep.). The employee is then presented with a logon screen to access the data stored on the mainframe. ECF No. 174-3 at 10 (Said Dep.).

To log on and interact with the mainframe, an Express employee also needs valid security credentials. *Id.* Because of the legally protected patient data stored on the mainframe, Express uses a security package called Resource Access Control Facility ("RACF") to control access to the mainframe. ECF No. 186-2 at 4 (Mudhenk Dep.). Only a subset of Express employees are granted RACF usernames and passwords to access the mainframe. ECF No. 186-3 at 7 (Said Dep.) Without RACF credentials, an Express employee can launch Rumba software but cannot access mainframe data. ECF No. 174-3 at 11 (Said Dep.).[2]

Since at least 2001, Express has used some version of Rumba software that it had first purchased from Micro's predecessor, NetManage. ECF No. 186-1 at 11 (Miller Dep.). Initially, Express used Rumba software only on individual desktop computers, or "thick client hardware," where the software is installed and used on the desktop itself. *Id.* at 4. In 2006, Express began transitioning to a "terminal server environment," in which "thick client" desktops were replaced with "thin client" hardware where the desktop is a "dumb device" connected via Express' network to a terminal server. *Id.* at 4, 14-15. With "thin clients" Rumba is installed on the

---

[2] While not an altogether perfect analogy, the parties referred to the Rumba software as the "tunnel" or connection to the mainframe, and the RACF logon credentials as the keys that unlock the door to the mainframe data. The Rumba software plays no role in an Express employee's use or manipulation of that data once the door is opened with RACF credentials.

server itself, and all processing takes place on the terminal server to which the desktop connects. *Id.* at 4-5. Express uses Citrix and Windows Terminal Services (collectively, "Citrix")[3] as terminal servers which provide "a way to access applications remotely without having the software on the PC." ECF No. 186-4 at 8 (Ford Dep.). Accordingly, Express began purchasing Rumba software for both thick and thin client deployments. ECF No. 186-6 at 15 (Miller Dep.). At the time of the dispute forming the basis of this case, Express owned perpetual licenses for up to 955 concurrent users of Rumba software, and 8,975 perpetual non-concurrent use licenses. ECF Nos. 186-8 at 3, 186-10 at 2-3. A concurrent license permitted Express to install Rumba on a server for access by a designated number of users at any given time.

In 2008, Micro purchased NetManage, thereby acquiring the relationship with Express. ECF No. 186-9 at 4 (Grant Dep.). In 2009, Micro began an "'all you can eat' enterprise license" initiative for Rumba software where clients would not have to count the number of software installations as had been used in the industry under various types of licensing agreements. ECF No. 186-16 at 2. The program, internally named "Footprints" established a target pricing schedule of $205,000 for the license and a $45,000 maintenance fee the first year, followed by $45,000 each following year. *Id.*

In January 2010, Rocket Software, one of Micro's competitors, offered Express a similar terminal emulation software package as an "enterprise license" that covered both thick and thin client hardware and had no limitations on the number of users who could access the software. ECF No. 186 at 12. *See also* ECF No. 186-24 at 3 (Stavropoulos Decl.) (describing "enterprise license" as an "'all you can eat option' allowing deployment to an unlimited number of users.").

---

[3] Micro uses Citrix and Windows Terminal Services synonymously in its administrator's guide. The Court follows suit. *See also* ECF 186-4 at 8 (Ford Dep.) (referring to the two terminal servers as "synonymous. They are two peas in a pod.").

Express' contract for technical support on its existing Rumba software licenses was due for renewal at the end of May 2010, ECF No. 186-10 at 2, and Express' Director of National Field Services, Peter Miller, informed Micro about the discussion with Rocket Software and offered to hear Micro's counter offer. ECF No. 186-6 at 11 (Miller Dep.).

On May 12, 2010, Richard Ford at Micro emailed Miller, acknowledging the "extremely aggressive offer" from Rocket. Ford wrote that "Micro Focus is please[d] to offer Express Scripts an enterprise license that will help Express Script[s] achieve its financial goals with zero risk." ECF No. 174-17 at 2. Ford offered Express "[u]p to but not to exceed 10,000 Rumba and/or Onweb Web to Host site license for the benefit of Express Scripts users," for $250,000, to include the first year of support, with $45,000 for support each of the two following years. *Id.* Ford concluded the email by noting that it had taken him longer to come up with Micro's offer, because "it took a bit more discussion with our senior management." *Id.*

Indeed, before Ford could extend a formal quote, he needed approval. ECF No. 186-27. Ford's supervisor David Vano emailed his supervisor, Michael Steinmetz, and Archie Roboostoff, Project Manager for Rumba, with the subject line "Footprints Approval," asking them to bless the offer made to Miller. *Id.* While some at Micro resisted the idea of "cannibalizing" the existing customer base with an offer intended to encourage obtaining new business, the ultimate consensus was to extend promotional pricing to Express. *Id.* The next day, Ford faxed the Product Order to Miller. The Product Order specified that "[e]xcept as otherwise specified above or agreed in writing by [Express and Micro], Micro Focus End User License Agreement . . . terms shall apply to this Product Order." ECF No. 186-28 at 3. The Product Order described the product as "RUMBA Enterprise v. 8.3.0 for x86 running Win XP, Vista, Windows 7, Server 2003, Server 2008 for 10000 **Authorized User License**." *Id.*

(emphasis added).  Express responded with a purchase order that repeated the same product language.  ECF No. 186-29.  Micro also internally recorded the Express order to be the "same structure as Citi Rumba Enterprise Deal," an enterprise license as part of the Footprint program, and designed to keep the competition, "Bluezone of [sic] the acct."  ECF No. 186-30.

In connection with this Product Order, Micro submitted a questionnaire to Express in which Express IT personnel noted that the software purchase was for "10,000 desktop."  ECF No. 186-54.  Additionally, email exchanges between Micro and Express IT personnel reflect contemporaneous discussions about managing the number of users to stay within the terms of the contract.  ECF No. 186-55.

On June 10, 2010, Micro emailed the Rumba software in various zip files for installation.  ECF No. 174-20.  The record is not clear specifically where this Rumba purchase was installed, if at all.  ECF No. 174-18.[4]  The email also included an End User License Agreement (EULA) which Express was required to click through before installation of the software.  ECF No. 174-5 at 6.

The EULA specifically identified the licensing arrangement for Rumba and provided several different licensing options.  ECF 174-23 at 7.  However, the EULA made no reference to the "authorized user" license noted in the Product Order.  *Id.*  Rather, the EULA articulated seven license models, two of which appear pertinent to this case: (1)  a "workstation license," which permitted the licensee to "install and use one copy of the licensed Software on a standalone workstation" and prohibited the installation of the software on a server that allowed use to more than one individual, and (2) a "concurrent user license," which permitted the licensee to install and use the license "for use by the maximum number of Concurrent Users . . .

_____

[4] At the hearing, counsel for Express proffered that the software was not launched from the email Micro sent in connection with this purchase.

for whom Licensee has paid the applicable license fee." *Id.* The EULA "concurrent user" license also restricted the total number of users to "the number of Concurrent Users expressly authorized by Licensor in the Product Order."[5] *Id.* This contract was in place for three years.

In 2013, when the contract was up for renewal, internal correspondence between Express IT employees suggested that they understood the 2010 contract to be for 10,000 workstation licenses as opposed to concurrent user licenses. Express noted that in renewing the contract with Micro, it may "need to change some of the Rumba licenses to include Citrix." ECF No. 174-29 at 2. Contemporaneous internal documentation also reflects that Express employees understood that the "10,000 authorized user" license to be for "desktop" installation, which is consistent with Micro's understanding that the term "authorized user" meant the same as "workstation" license. *Id.* at 9. Additional internal email communication reflects Express' concern that it needed to "limit the access" of Rumba to "users that actually use /need the applications," as well as to "track how many people need licensing for these applications." ECF No. 189-10 at 3. Ultimately, Express noted in September of 2013 that "We are technically out of compliance with our current licensing model of giving everyone or [sic] Level 1 Citrix access for Rumba." ECF No. 189-11 at 2.

In 2015, Micro began a "software license verification" audit of Express' software installations. ECF No. 174-34 at 4. During this audit, Express reported to Micro that all 35,236 users were able to access Rumba software via Citrix, but only 4,932 of those users had credentials to access the mainframe. ECF No. 174-35 at 2. Micro thereafter informed Express that because it considered a user to be any Express employee who *could* access the software, and

---

[5] At the hearing, Express also argued that a third available Rumba software license, termed "concurrent user with load configuration" more closely approximates what Express believed it purchased.

the agreement provided for up to 10,000 such users, Express far exceeded the number of authorized Rumba deployments.  ECF No. 174-44 at 2-3.

On April 1, 2016, Micro filed suit against Express, asserting claims of copyright infringement (Count I), breach of contract (Count II), and unjust enrichment (Count III).  ECF No. 1.  Express counterclaimed.  ECF Nos. 33, 71.  Micro moved to dismiss Counts II to V of Express' Amended Counterclaims.  ECF No. 74.  At a motions hearing held on November 6, 2017, the Court granted Micro's motion to dismiss Counterclaim Counts II (promissory estoppel) and IV (fraudulent inducement) and denied the motion for Counts III (intentional misrepresentation) and V (negligent misrepresentation).  ECF No. 111.  Express then withdrew Count III, leaving Count I (breach of the covenant of good faith and fair dealing) and Count V (negligent misrepresentation) as the amended counterclaims.  ECF No. 145.

After the close of discovery, Micro moved for summary judgment on the remaining counterclaims and each of Express' twenty-six affirmative defenses.  ECF No. 171.  Express filed a cross-motion for summary judgment in its favor as to all claims brought by Micro.  ECF No. 185.  The Court now turns to these motions.

## II.    Standard of Review

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.,* 637 F.3d 508, 512 (4th Cir. 2011).  Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  "In

responding to a proper motion for summary judgment," the opposing party "must present evidence of specific facts from which the finder of fact could reasonably find for him or her." *Venugopal v. Shire Labs*., 334 F. Supp. 2d 835, 840 (D. Md. 2004), *aff'd sub nom. Venugopal v. Shire Labs., Inc*., 134 F. App'x 627 (4th Cir. 2005) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986); *Celotex*, 477 U.S. at 322–23)). Genuine disputes of material fact are not created "through mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Where a party's statement of a fact is "blatantly contradicted by the record, so that no reasonable jury could believe it," the Court credits the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

When considering cross-motions for summary judgment, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation and internal punctuation omitted). "[T]he facts relevant to each must be viewed in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

## III. Analysis

### A. Express' Motion for Summary Judgment

#### i. Breach of Contract

Express contends that Micro's breach of contract claim fails as a matter of law because no reasonable trier of fact could construe the agreement as providing 10,000 workstation licenses, but rather the only commercially reasonable interpretation is that the license granted 10,000 concurrent users of Rumba software. Express also argues that because Express at no time

had more than 10,000 concurrent *users* of Rumba, Micro's claim fails.[6]  However, Micro rightfully highlights the record evidence suggesting the agreement was for 10,000 desktop users, or work stations, which precludes summary judgment.  For the following reasons, the Court agrees with Micro and denies summary judgment on the breach of contract claim.

At the outset, the parties disagree as to what documents form the operative contract. Express contends that the Product Order and email extending the offer form the operative contract.  Micro, by contrast, argues that the Product Order plainly incorporates the EULA under its "Terms and Conditions."  The Product Order Terms and Conditions clearly state that "[e]xcept as otherwise specified above or agreed to in writing by Licensee and Micro Focus, Micro Focus End User License Agreement . . . *shall* apply to this Product Order."  ECF No. 174-21 (emphasis added).  Micro further underscores that Express at no point sought modification in writing or otherwise objected to this term.  Accordingly, when viewing the evidence most favorably to Express, no reasonable trier of fact could separate the Product Order from the EULA.  The EULA and the Product Order, read together, constitute the contract at issue.

However, as the parties are painfully aware, the EULA and Product Order, read together, are ambiguous as to what specific kind of license Express sold to Micro.  The Product Order is to purchase a license for "10,000 authorized users."  The EULA, however, nowhere defines the term "authorized user" and instead with respect to Rumba software, offers seven separate licensing options.  Accordingly, what the parties meant by "authorized user" is indeed ambiguous.

---

[6] Because the parties do not dispute that a contract had been formed, the parties also agree that Micro's unjust enrichment claim must be dismissed.  ECF No. 189 at 10.  *See Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 101 (2000) (unjust enrichment "cannot be asserted when an express contract defining the rights and remedies of the parties exists.").  Accordingly, Count III of Micro's Second Amended Complaint is dismissed.

Contract language is ambiguous if "to a reasonably prudent person, the language used is susceptible of more than one meaning." *Bd. of Educ. of Charles Cty. v. Plymouth Rubber Co.*, 82 Md. App. 9, 26 (1990). "An ambiguity does not exist simply because a strained or conjectural construction can be given to a word." *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 54 (2013) (quoting *Belleview Const. Co. v. Rugby Hall Cmty. Ass'n, Inc.*, 321 Md. 152, 159 (1990)). The EULA is no help in this respect. Although it does define various types of licenses, an "authorized user license" is not among them.

Where a contract is ambiguous, a finder of fact may consider extrinsic evidence "which sheds light on the intentions of the parties at the time of the execution of the contract." *Heat & Power Corp. v. Air Prod. & Chemicals, Inc.*, 320 Md. 584, 596–97 (1990). "The cardinal rule of contract interpretation is to give effect to the parties' intentions." *Dumbarton Imp. Ass'n, Inc.*, 434 Md. at 73 (quoting *Tomran, Inc. v. Passano*, 391 Md. 1, 14 (2006)). Extrinsic evidence may include the "negotiations of the parties, the circumstances surrounding execution of the contract, the parties' own construction of the contract and the conduct of the parties." *Canaras v. Lift Truck Servs., Inc.*, 272 Md. 337, 352 (1974).

At summary judgment "[i]f the extrinsic evidence does not raise genuine factual disputes, the Court may resolve the ambiguity on its own." *Chaplick for Canal Vista Tr. v. Jeng Fen Mao*, 215 F. Supp. 3d 470, 481 (D. Md. 2016) (citing *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985)). "If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact." *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (quoting *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993)).

As an initial matter, the Court must determine whether it will consider, as part of the record evidence, Express employees' statements in 2013 and 2015 as to the meaning of the 2010 license agreement. Express contends that the Court should exclude this evidence from consideration as irrelevant to the parties' intentions supporting the 2010 contract. The Court disagrees.

Express is correct that discussion surrounding a contract among individuals not involved in the formation of the contract cannot "shed light on the intentions of the parties *at the time of the execution of the contract*." *Heat & Power Corp*., 320 Md. 584, 597 (1990) (emphasis added). *See also Feldman's Med. Ctr. Pharmacy, Inc. v. CareFirst, Inc.*, 823 F. Supp. 2d 307, 320 (D. Md. 2011) (rejecting employee's interpretation of the contract when she joined company six years after contract was formed). However, the contract at issue is for goods and services provided over a three-year period and subject to renewal. Certainly the words and acts of Express and Micro's staff, tasked with implementing or complying with the contract, is probative of each party's understanding of the contract terms. *See* Corbin on Contracts § 24.16 ("The practical interpretation of a contract may thus be evidenced by the parties' acts or their words."). *See also Dep't Pub. Safety and Corr. Svcs. v. ARA Health Svcs. Inc.*, 107 Md. App 445, 454 n. 3 (1995) (recognizing that the "parties' course of performance" may clarify an ambiguous contract provision). Because the respective parties' course of performance is relevant to interpreting ambiguous contract terms, the Court will consider the 2013 and 2015 record evidence in determining whether summary judgment is appropriate.

When viewing the evidence most favorably to Micro, the breach of contract claim survives challenge. Not surprisingly, Micro's representatives attest that in their corporation, "authorized user" is synonymous with "workstation." ECF Nos. 189-8, -9. Micro also contends

that the product keys provided to Express allowed installation of Rumba only on workstations, and not through Citrix or the platform that would permit concurrent users to access the software. ECF No. 189-8 at 5.  Additionally, Express' own IT employees interpreted the contract in a manner which is consistent with a workstation license.  In 2013, Express staff admitted internally to being over-deployed and sought strategies to "track how many *people* need licensing for these applications."  *Id.* (emphasis added).  Express also privately admitted in September of 2013 to be "technically out of compliance with our current licensing model of giving everyone or [sic] Level 1 Citrix access for Rumba."  ECF No. 189-11 at 2.  Because a rational trier of fact could rely on such evidence to find in Micro's favor, the meaning of 10,000 authorized user licenses must be resolved at trial.

Express, in response, urges the Court to grant summary judgment because Micro's interpretation leads to a "commercially unreasonable" or "absurd" result, *Ramlall v. MobilePro Corp.*, 202 Md. App. 20, 42 (2011), because "[n]o rational customer would purchase a software license so its users could see a login screen."  ECF No. 186 at 25.  While it may be true that no rational customer would purchase a software license solely for a login screen, this is not what Micro argues.  Rather, Micro contends that the contract authorized access and use from 10,000 workstations, and that Express breached that agreement by installing the software so that well in excess of 10,000 employees had access via Citrix and equally unfettered use by being able to click on the Rumba icon and gain connection to the mainframe.  Accordingly, Express' reference to an absurd result is inapposite here.

Express also urges the Court to apply the doctrine of *contra proferentem*, or "the basic principle of contract law that, in construing the language of a contract, ambiguities are resolved against the draftsman of the instrument."  *John L. Mattingly Const. Co. v. Hartford Underwriters*

*Ins. Co.*, 415 Md. 313, 327 (2010) (quoting *Burroughs Corp. v. Chesapeake Petroleum & Supply Co., Inc.*, 282 Md. 406, 411 (1978)).  Express contends more particularly that the Court must construe any ambiguities in the EULA and Product Order against Micro, and that if Express offers a reasonable interpretation consistent with how it deployed the software, then summary judgment is appropriate.   Express further contends that because the EULA is a classic contract of adhesion, *contra proferentem* must apply.

As an initial matter, the Court cannot agree that the contract at issue is one of adhesion. A contract of adhesion "is drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms." *Walther v. Sovereign Bank*, 386 Md. 412, 430 (2005) (quoting Restatement (Second) of Conflict of Laws § 187 cmt. b).  Express has generated no evidence that Micro is the dominant party—indeed, as noted at the hearing, Express is a multimillion dollar pharmacy benefits corporation which outpaces Micro in size and sophistication.  Moreover, Micro afforded Express the opportunity to negotiate or reject the EULA terms prior to accepting the product.  ECF No. 186-28 at 3.  Thus, Express was afforded "meaningful choice."  *Freedman v. Comcast Corp.*, 190 Md. App. 179, 209 (2010) ("We do not need to examine the parties' relative bargaining power to determine whether [a relevant provision] was a contract of adhesion because appellant had a meaningful choice.").  *See also Choice Hotels Int'l, Inc. v. Chewl's Hosp.*, Inc., 91 F. App'x 810, 815 (4th Cir. 2003) (affirming the finding of the district court that a franchise agreement was not a contract of adhesion when the franchisee was "not an unsophisticated consumer, nor was the contract a consumer transaction.").

Secondly, the doctrine of *contra proferentem* applies only where the court cannot resolve the ambiguity by consulting extrinsic evidence *and* "where no material evidentiary factual

dispute exists." *Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 460 (2006). *Cf. Rossi v. Douglas*, 203 Md. 190, 198 (1953) (stating that "[t]he rule that doubtful language is to be interpreted against the party who drafted the instrument is only a secondary rule of construction."). If genuine issues of material fact remain as to the intended meaning of the pertinent contract terms, "construction of the ambiguous contract is for the jury." *Collier v. MD-Individual Practice Ass'n, Inc.*, 327 Md. 1, 6 (1992).

As detailed above, genuine issues of material fact remain as to the meaning of "authorized user," and so the doctrine of *contra proferentem* does not apply here. *Washington Metro. Area Transit Auth.*, 476 F.3d at 235. *See also DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 470 (2015) ("[T]he reach of the canon construing contract language against the drafter must have limits, no matter who the drafter was."). To allow otherwise would mean that claims of contractual ambiguity must be taken away from the jury once the Court ascertains *a* reasonable meaning in favor of the non-drafter, competing facts be damned. The law does not support reading the doctrine to supplant the function of the jury. Summary judgment is therefore denied on the breach of contract claim.

### ii.     Standing to Sue for Copyright Infringement

With respect to the copyright infringement claim, Express contends that summary judgment must be granted in its favor because Micro is not the legal or beneficial owner of the copyright at issue. Rather, Express contends that Micro Focus IP Development Limited ("Micro IP") is the sole legal or beneficial owner of an exclusive right under a copyright who is entitled to institute an action for the infringement of that right. *See* 17 U.S.C. § 501. Micro, says Express, thus lacks prudential standing to bring a claim for copyright infringement.[7]

---

[7] "There exist two strands of standing: Article III standing, which ensures that a suit presents a case or controversy as required by the Constitution, and 'prudential standing,' which encompasses 'judicially self-imposed

14

Micro does not dispute that Micro IP owns the copyright. Instead, Micro contends that because it is listed under the "rights and permissions" heading of the copyright registration, it may assert the claim on Micro IP's behalf. However, the "rights and permission" designation does not confer standing to sue for copyright infringement. Instead, it does little more than afford information for the "organization that should be contacted for permission to use the work." Compendium of U.S. Copyright Office Practices § 622.1 (3d. Ed. 2017). Copyright ownership for purposes of enforcing the copyright may only be conveyed "in writing and signed by the owner of the rights conveyed." 17 U.S.C. § 204. Because a "copyright infringement action may only be brought by the 'legal or beneficial owner' of a copyright," Micro lacks standing to bring this claim. *Ctr. City Music v. Kisner*, 23 F.3d 400, 1994 WL 159769 at *5, (4th Cir. 1994) (table) (quoting 17 U.S.C. § 501 (b)); *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc*., 618 F.3d 417, 428 (4th Cir. 2010) ("A plaintiff claiming copyright infringement must establish ownership of the copyright by plaintiff. . . ."). *See also Silvers v. Sony Pictures Entm't, Inc*., 402 F.3d 881, 886 (9th Cir. 2005) (charting the legislative history of the Copyright Act to conclude that "Congress did not envision . . . that the right to sue was a right severable from ownership of one of the authorized exclusive rights.").

---

limits on the exercise of federal jurisdiction.'" *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 753 (4th Cir. 2013) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Prudential standing "demands that the court be very cautious when the 'plaintiff's claims to relief rests on the legal rights of third parties.'" *Zaycer v. Sturm Foods, Inc*., 896 F. Supp. 2d 399, 408 (D. Md. 2012) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Express' contention regarding the copyright claim is a challenge to Micro's prudential standing. *Callender v. Callender*, No. TDC-15-4015, 2016 WL 3647613, at *3 (D. Md. June 30, 2016).

Alternatively, Micro argues that the Court should substitute Micro IP as the real party in interest for the copyright claim pursuant to Rule 17(a)(3) of the Federal Rules of Civil Procedure. Rule 17(a)(3) states:

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

The Court may grant joinder or substitution under Rule 17(a) if the plaintiff made an "understandable mistake" in bringing the action in the plaintiff's own name, rather than the real party in interest. *Intown Properties Mgmt., Inc. v. Wheaton Van Lines, Inc*., 271 F.3d 164, 171 (4th Cir. 2001). Where the Plaintiff failed to name the real party in interest as a deliberate or tactical maneuver, however, joinder or substitution is disfavored. *Callender*, 2016 WL 3647613, at *3. The Court may also consider any possible prejudice to the defendant by allowing joinder substitution. *Hill v. BASF Wyandotte Corp*., 782 F.2d 1212, 1214 (4th Cir. 1986).

Express urges the Court to deny Plaintiff's relief under Rule 17(a) because its failure to name Micro IP is not an understandable mistake. In discovery, Express repeatedly requested proof of Micro's right to sue for copyright infringement. *See* ECF No. 186-67 at 10 (request to Micro to produce "any and all documents relating to the ownership of each identified Work as to which You allege copyright infringement in this action"). Micro never disclosed any additional documentation apart from the "rights and permissions" designation. Thus, says Express, Micro should be precluded from belatedly joining Micro IP as a party.

The Court finds that Micro's failure to name Micro IP is not an understandable mistake. The discovery requests were timely and plain. Micro never responded, and never sought to join Micro IP throughout the course of this litigation. *See Intown Properties Mgmt., Inc*., 271 F.3d at

171 (affirming the district court's finding that plaintiff's failure to join an action was not understandable when plaintiff was represented by counsel and had notice of the action, yet failed to seek to join until after a limitations problem became apparent). Accordingly, Express' motion for summary judgment is granted as to Count I, copyright infringement.

### iii. Measure of Damages

Express asks the Court to decide as a matter of law that even under Micro's theory of the case, damages should be determined by reference to the actual number of simultaneous users of Rumba software. Under the terms of the EULA, if Express' usage exceeds the agreed upon terms, Express must pay Micro "the then current license and maintenance fees for the use of the additional licenses." ECF No. 186-43.

Micro's damages claim turns on the definition of "Concurrent User License." ECF No. 186-70 (Micro's Expert Report by Britven). At the hearing, Micro agreed that it will confine its damages profile to any concurrent user deployment in excess of the 10,000 workstation licenses that it claims to have sold Express. More particularly, Micro agrees that the damages will be driven by "the total number of users who may access and use the Licensed Software at any given time." ECF No. 186-43 at 7 (definition section of EULA for Concurrent User License).

Although the parties at the hearing engaged in a robust discussion about how the term "may access and use" will, as a matter of fact, support Micro's damages claim, this dispute is not capable of resolution at the summary judgment stage.[8] In light of Micro's agreement that its

---

[8] At the hearing, Micro offered various factual scenarios illustrating the practical differences between "access" and "use" in the EULA. "Access," for example, may mean a licensee corporation's deployment of Rumba on Citrix either unfettered or available to a subpopulation of users by way of an Active Directory; whereas "use" may mean the ability to launch Rumba from the icon made available on the user's computer. Micro further illustrated many ways in which a licensee can practically limit "access" (by limiting deployment of the software on Citrix) and then further limit "use" by restricting the launching of Rumba through password access. Express, by contrast, argued that no practical difference exists between "access" and "use" given the reality of Rumba – that because Rumba is software which provides a connection to the mainframe, access *is* use. This issue remains, in the

damages argument will be driven by the plain language of the Concurrent User definition in the EULA, the Court denies Express' motion as moot.

## B. Micro's Motion for Partial Summary Judgment

### i. Express' Counterclaims

Micro asks the Court to grant summary judgment in its favor on Express' remaining two counterclaims and twenty-six affirmative defenses, arguing that all are unsupported by evidence in the record.  Express does not oppose the motion for summary judgment as it relates to its counterclaim for negligent misrepresentation because this claim is more accurately captured as a defense.  ECF No. 186 at 56 n. 23.  Accordingly, Express' counterclaim for negligent misrepresentation is dismissed.

Express' sole enduring counterclaim, then, is for breach of the covenant of good faith and fair dealing.  Express contends that Micro's claim in 2015 that Express was over-deployed interfered with its ability to continue its longstanding relationship with Micro.  Express persists in this argument despite the uncontroverted fact that as of the filing of Express' counterclaims, Express was still using Rumba while transitioning to another vendor.  ECF No. 186 at 55; ECF No. 174-3 at 5.

Although Maryland recognizes an implied covenant of good faith and fair dealing, "the covenant is limited to prohibiting one party from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Edell & Assoc. P.C. v. Law Offices of Peter Angelos*, 264 F.3d 424, 444 (4th Cir. 2001) (citing *Eastern Shore Mkts., Inc. v. J.D. Assocs., Ltd. P'ship*, 213 F.3d 175, 182-83 (4th Cir. 2000) (emphasis omitted).  *See also Willis v. Bank of America Corp.*, No. ELH-13-02615, 2014 WL3829520 at *38 (D. Md. Aug. 1, 2014)

---

Court's view, dependent in large part on the evidence introduced at trial on the manner in which the software is actually installed and used.

("Because plaintiff has not alleged that defendants prevented him from performing his duty under the contract, he fails to state a claim based on breach of the duty of good faith and fair dealing."). Express contends that it had "no choice" but to switch vendors in 2018 because of Micro's position in this case. ECF No. 186 at 55. But this is, indeed, a choice that Express made years after this lawsuit began. Express has provided no authority that *choosing* to engage a different software vendor constitutes interference with its ability to perform on a contract. Thus, the Court grants summary judgment in favor of Express on this claim.[9]

### ii.      Express' Affirmative Defenses

Micro argues that summary judgment should be granted in its favor as to all twenty-six Express' affirmative defenses because each defense is either based on an invalid or improper legal theory or lacks evidentiary support to survive summary judgment. Express does not oppose the entry of summary judgment as to defenses Nos. 2, 4 (setoff only), 5-13, 22 (c)-(f) & (i), 24, and 26 at trial, and so Micro's motion is granted as to these defenses.

Express, however, wishes to pursue what it characterizes as the defenses of "recoupment" and unclean hands. "Recoupment is the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim." *First Nat'l Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 n. 1 (4th Cir.1982) (citing 6 C. Wright & A. Miller, Fed. Prac. & Proc., Civil § 1401 (1971 & Supp. 1982)); *see also Imbesi v. Carpenter Realty Corp.*, 357 Md. 375, 380 (2000) ("'[R]ecoupment' means a diminution or a complete counterbalancing of the

---

[9] At the hearing, and for the first time, Express raised that Micro's representations during the life of the 2010 contract that Express had purchased "Rumba Enterprise" which "includes all products & Citrix" (ECF No. 185 at Ex. 64) is the course of conduct that "prevented Express from performing on the Contract." The Court cannot credit that mere assertions between the parties is tantamount to *preventing* contract performance. *Cf. Glassman Const. Co. v. Maryland City Plaza, Inc.*, 371 F. Supp. 1154, 1161 (D. Md. 1974) (where defendant failed to secure construction permits, "[t]he natural consequence . . . was a bogging effect" that prevented performance of the construction contract and excused plaintiff's breach).

adversary's claim based upon circumstances arising out of the same transaction on which the adversary's claim is based. . . .").  Recoupment is triggered where a defendant suffers damages by the underlying conduct surrounding the breach.  *Smith v. Smith,* 79 Md. App. 650, 658 (1989).

The doctrine of unclean hands is designed to prevent those who have engaged in misconduct to secure a right from using the courts to enforce that same right.  *Hicks v. Gilbert*, 135 Md. App. 394, 400 (2000).  Generally, the Court retains "'broad discretion in determining whether and how to apply' the doctrine, but there must be a sufficient 'nexus between the misconduct and the transaction' at issue to justify application."  *United Bank v. Buckingham*, 301 F. Supp. 3d 561, 568 (D. Md. 2018) (quoting *Mona v. Mona Elec. Group, Inc.*, 176 Md. App. 672, 714 (2007).

At the hearing, both parties agreed that the Court cannot determine as a matter of law whether Express is precluded from pursuing either of these theories.  To be sure, both parties agreed that Express can and will introduce evidence to support its theory that Micro engaged in a "bait and switch," by Micro's course of conduct which led Express to believe it was buying a concurrent user license rather than a workstation license.  Accordingly, the parties agreed that the Court would deny as moot Micro's motion with the understanding that the final resolution of this question is best left for briefing and articulation related to jury instructions.  The Court will address in what manner the jury will be instructed on these defenses, if at all, after further briefing in advance of trial.

### IV.     Conclusion

For the foregoing reasons, the Court grants Plaintiff-Counter Defendant Micro's motion as to Counterclaim Count I (breach of covenant of good faith and fair dealing) and Count V (negligent misrepresentation).  The Court grants Defendant-Counter Plaintiff Express' motion as

to Count I (copyright infringement) and Count III (unjust enrichment). The cross-motions are

otherwise denied.  A separate Order follows.


___2/12/2019_____                              _____/S/_____
Date                                                Paula Xinis
                                                    United States District Judge