IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MICRO FOCUS (U.S.), INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. PX-16-0971 |
| EXPRESS SCRIPTS, INC., | * | |
| Defendant. | * | |
| | * | |

******

**MEMORANDUM OPINION**

Following a nine-day trial in this contract dispute, the jury returned a verdict for Defendant Express Scripts, Inc. ("Express"). ECF No. 295. Now pending before the Court is Plaintiff Micro Focus (U.S.), Inc.'s ("Micro's") motion for a new trial, ECF No. 320, and Express's motion for attorneys' fees, ECF No. 319. The motions are fully briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the reasons that follow, Micro's motion is denied. The Court will also defer decision on Express's motion and allow briefing as to the propriety of attorneys' fees, if necessary, and consistent with this opinion.

**I.    Background**

Evidence at trial established the following: Express is a pharmaceutical benefits management company that stores sensitive customer information on its computer mainframe. *See* ECF No. 300 at 90:8–12; No. 307 at 135:13–17; ECF No. 311 at 103:2–12, 104:2–16. Express uses terminal emulation software to allow its employees secure access to the mainframe. ECF No. 307 at 17:1–18:6, 135:13–17. Micro is a software development company that sells to commercial customers a wide variety of software products. *Id.* at 14:6–25. Trial concerned Express's purchase in June 2010 of Micro's terminal emulation software, Rumba.

1

Broadly speaking, Rumba may be used in one of two ways. *Id.* at 131:19–24. Rumba for "thick clients" is installed on individual computers which then run the software locally and connect to a computer mainframe on which data is stored. ECF No. 300 at 65:13–24, 66:6–8. By contrast, Rumba for "thin clients" is installed on an external computer server which then connects to the mainframe. ECF No. 311 at 38:16–19. Express uses an external server system called Citrix. *See* ECF No. 307 at 32:5–18, 33:3–25; *see also id.* at 134:23–35:12.

Typically, Micro sells licenses to use Rumba according to a standard form contract called the End User Licensing Agreement ("EULA"). ECF No. 299 at 22:11–21 *see generally* ECF No. 325-24 at 6–7 (copy of the EULA admitted at trial). The EULA sets out terms and conditions of seven software licenses, each of which allows customers to use its software in critically distinct ways. ECF No. 325-24 at 6–7; *see* ECF No. 299 at 22:5–10; ECF No. 307 at 55:17–56:7. Micro's customers who purchase a software license must "click" through the EULA to accept the terms before using the software. ECF No. 299 at 29:23–30:6; ECF No. 307 at 56:19–25, 57:10–15.

One of the EULA-defined licenses is a "Workstation License," ECF No. 325-24 at 6–7, which is installed on thick clients, *see* ECF No. 307 at 64:1–10. When a company purchases one Workstation License for Rumba, it may install Rumba software on one desktop computer and access the mainframe from this desktop. *Id.* This licensing scheme allows Micro to charge its customers a per-workstation fee, thereby preventing customers from over-deploying the software without paying a commensurate price.

Licensing for thin client software works differently. One example of a thin client license under the EULA is a "Concurrent User License." *See* ECF No. 325-24 at 7. A customer that purchases one Concurrent User License obtains the right to have one employee access Rumba

through an external server. *See* ECF No. 307 at 131:25–132:5; ECF No. 309 at 60:20–61:7, 64:1–7.

Although Micro "normally" sells either Workstation or Concurrent User licenses, ECF No. 307 at 89:16–21; *see also* ECF No. 301 at 35:1–10, the jury also learned that customers may purchase several other types of thin client software licenses as described in the EULA, ECF No. 307 at 89:22–25, to include a "Named User License," *see* ECF No. 325-24 at 7. Named User Licenses function similarly to Concurrent User Licenses in that the customer may install the software on a server; the difference is that only a specified, or "named," list of employees may access Rumba. *Id.*; ECF No. 301 at 143:2–5.

Micro and Express's business relationship, as demonstrated at trial, was less than a model of clarity. In 2008 Micro purchased another software company called NetManage, thereby inheriting NetManage's existing contract with Express. ECF No. 307 at 22:1; *see* ECF No. 299 at 83:3–12. At that time, Express had purchased through NetManage 955 Concurrent User Licenses of Rumba software, and 8,975 licenses for a similar terminal emulation program called OnWeb Web-to-Host. ECF No. 299 at 83:3–12, 92:11–25.

Express meanwhile began planning to transition from thick to thin client models throughout its company. In early 2010, one of Micro's competitors, Rocket Software, approached Express about providing software similar to Rumba in a way to match Express's evolving needs. ECF No. 311 at 45:13–17, 46:7–25. Specifically, Rocket offered to replace Express's current Rumba software package with an "all you can eat" license package that would allow deployment of its Rumba-like software on Express's servers without a "user" limitation and for one flat fee of $110,000. *Id.* at 47:5–14, 49:11–19. Upon receiving this offer, Express

3

asked Micro to submit a counteroffer so that it could continue using Rumba rather than switch to Rocket. *Id.* at 50:2–9, 51:8–13.

Micro's counteroffer, argued Express, culminated in the June 2010 deal at the center of the parties' dispute. On May 12, 2010, Richard Ford at Micro emailed Peter Miller, Express's Director of National Field Services, to offer "Express Scripts an enterprise license that will help Express Script[s] achieve its financial goals with zero risk." ECF No. 325-51 at 3. Ford offered Express "[u]p to but not to exceed 10,000 Rumba and/or On[W]eb Web to Host site license for the benefit of Express Script's users," for $250,000, to include the first year of support, and $45,000 for support each of the two following years. *Id.* Notably, an "enterprise license" is not one of the standard licenses enumerated in the EULA. *See* ECF No. 325-24 at 6–7.

This offer, however, was similar to a promotional deal Micro was extending to potential new customers at that time. The sales program, named "Footprints," maintained an identical pricing structure to the Express deal. ECF No. 307 at 44:25, 45:1–9. Micro described Footprints as an "'all you can eat' enterprise license" initiative where clients would not have to count the number of software installations. *Id.* at 108:4–12. Ford sought approval to extend his offer to Express by emailing his supervisor with the subject line "Footprints Approval." ECF No. 325-45 at 2–3. Some sales representatives at Micro expressed reluctance about extending Ford's proposed offer because the promotions would, essentially, be used to "cannibali[ze]" the existing customer base. *Id.* at 2. But Micro eventually approved extending the offer to Express. *Id.*; ECF No. 307 at 115:9–11.

Once Ford received approval, he faxed a product order form to Miller memorializing the offered sale of "RUMBA Enterprise v. 8.3.0 for x86 running Win XP, Vista, Windows 7, Server 2003, Server 2008 for 10000 *Authorized User License*." ECF No. 325-23 at 3 (emphasis added).

4

Express, in response, emailed a purchase order to Micro to buy the software as described in the product order form. ECF No. 299 at 26:15–27:5. Micro's product order also stated that "[e]xcept as otherwise specified above or agreed in writing by [Express] and Micro Focus, Micro Focus End User License Agreement . . . terms shall apply to this Product Order." ECF No. 299 at 20:5–13; ECF No. 325-3. But, once again, the EULA did not include any license type named either an "Enterprise" or "Authorized User" license as reflected in the product order form. *See* ECF No. 325-24 at 6–7.

After Express emailed Micro its purchase order, Micro emailed Express zip files that included links to allow installation of the Rumba software. ECF No. 325-25 at 2–3. The email also stated that the EULA "shall apply to your use of the Micro Focus Software." *Id.* According to the email, installation of the software required Express to "click" through to accept the terms of the EULA. ECF No. 299 at 29:23–30:14.[1]

In 2015, Micro audited Express's use of Rumba. ECF No. 311 at 61:3–5. According to the audit results, Express had installed Rumba through Citrix which allowed all 35,236 Express employees the ability to access Rumba. ECF No. 301 at 88:17–22, 112:7–13. Express had also installed Rumba on 14,945 individual computers. *Id.* at 111:24–112:6. However, at trial, Express elicited evidence that not all 35,236 employees could use Rumba to view the mainframe. Rather, only some 7,500 employees with security credentials under a program called Resource Access Control Facility ("RACF") could log in and gain access to the mainframe using Rumba. ECF No. 307 at 67:6–13; ECF No. 311 at 111:22–112:21, 115:5–116:5. Thus, Express

---

[1] In 2013, Express acquired Medco which also owned Micro software licenses. ECF No. 300 at 44:21–24; ECF No. 301 at 111:11–18; ECF No. 302 at 8:9–11. As part of the acquisition, Express assumed Medco's 8,372 Workstation Licenses and 300 Concurrent User Licenses, neither of which are material to Micro's motion. ECF No. 301 at 111:11–18; ECF No. 309 at 42:4–8.

maintained, RACF access ensured that Express stayed within the limits of "10,000 Authorized Users."

Based on the 2015 audit, Micro contended that Express breached its contract with Micro by over-deploying the software. Micro consequently filed suit, alleging that Express had purchased Workstation Licenses in 2010 and thereafter over-deployed such licenses as reflected in the 2015 audit. *See* ECF No. 1.[2]

Throughout the pretrial litigation, Micro's primary, if not sole, theory of liability rested on Express's over-deployment of Workstation Licenses in violation of the EULA. *See id.* ¶¶ 22–23, 38; ECF No. 27 ¶¶ 23–24, 39; ECF No. 151 ¶¶ 6, 28–29, 33, 35–37, 39, 60, 87, 94, 97.[3] Micro contended that because Express installed Rumba on Citrix, Express had misused the software, breached the EULA and had to pay Micro for the number of Workstation Licenses that exceeded 10,000. ECF No. 27 ¶¶ 35–37, 41.

At the summary judgment phase, Micro confirmed that its "theory of the case and [its] theory of damages [was] that" it sold Express "a Workstation License." ECF No. 205 at 60:19–22; *see also id.* at 113:10–11. ("So, you know, they own 10,000 Workstation Licenses under the EULA."). Then again at the pretrial conference on April 10, 2019, Micro once more focused solely on Express's purchase and subsequent overdevelopment of Workstation Licenses. ECF No. 259 at 22:17–19 ("The damages theory is that Express Scripts bought 10,000 Workstation Licenses for installation on workstation computers."); *see also id.* at 25:5–9, 125:10–12.

---

[2] Micro also brought an unjust enrichment claim which it abandoned during the summary judgment stage. ECF No. 201 at 9 n.6; ECF No. 189 at 10, 42.

[3] Although Micro noted in its Complaint that Express's alternative arguments during the audit that it had purchased "either Authorized User licenses, Concurrent licenses, or Named User licenses," would still put Express in breach of the respective license terms, ECF No. 27 ¶ 40, Micro consistently alleged that it had sold Express Workstation Licenses only in the June 2010 transaction.

At trial, Micro stayed the course, arguing to the jury solely that Express had purchased and over-deployed Workstation Licenses. Micro's opening framed for the jury that it would establish three basic and critical facts: "First, Express Scripts and Micro Focus had a contract that allowed Express Scripts to install Micro Focus software on 10,000 workstation computers"; second, Express breached this contract; and third, Express "admitted" its breach. ECF No. 306 at 31:8–16. Micro's PowerPoint presentation declared for the jury, boldly, that "Express Scripts and Micro Focus contract[ed] for workstation licenses." ECF No. 325-3 at 3. Then, explaining that the term "authorized user" from the product order was synonymous with "Workstation License," Micro presented to the jury only one lens through which to view the evidence—that the parties agreed to purchase and sell Workstation Licenses in 2010, and now Express must pay for its over-deployment. *See* ECF No. 306 at 37:10–16, 41:6–11, 43:4–8, 45:24–46:10, 54:6–7, 57:16–17.

During its case in chief, Micro called several witnesses to testify that "authorized user" in the 2010 documents consummating the deal with Express meant that Express had purchased Workstation Licenses. ECF No. 299 at 15:1–16; ECF No. 301 at 107:4–9; ECF No. 307 at 30:12–17; 31:14–19, 32:19–33:2, 34:20–22. Micro also introduced evidence of internal conversations at Express that suggested Express believed it had purchased Workstation Licenses. For instance, when negotiating renewal of the contract in 2013, Express wrote that it may "need to change some of these Rumba licenses to include Citrix." ECF No. 300 at 98:6–17. Express also noted in September of 2013 that "[w]e are technically out of compliance with our current licensing model of giving everyone or [sic] Level 1 Citrix access for Rumba." *Id.* at 19:8–16.

Express at trial pushed back vigorously on Micro's Workstation License theory. Express maintained, in opening argument and in presenting its case, that it would have made little sense

7

for Express to have purchased Workstation Licenses when it was transitioning to thin client software. ECF No. 302 at 41:13–19, 42:10–11. Indeed, Express highlighted that Rocket's offer in 2010 was specifically designed to fulfill Express's desire to make this transition. *Id.* at 47:3–14. Express articulated this strategy to Micro in advance of the 2010 purchase, and therefore understood Micro's offer to include the right to install Rumba on Citrix. *Id.* at 52:23–53:17. In the words of one Express witness, Rumba with Citrix rights was "table stakes . . . to move forward" with Micro's deal. ECF No. 303 at 27:18–28:4.

Express's defense to Micro's Workstation theory accordingly proceeded as follows. In opening, Express maintained that it had purchased an "Enterprise License[,] . . . a special kind of license that isn't in [Micro's] price list, and it isn't in [Micro's] standard click-through license agreement" and so was not described in the EULA. ECF No. 306 at 83:12–18. Express maintained that the language "Enterprise License" came directly from Ford's offer email to Miller in 2010. ECF No. 325-51 at 3. Express elicited testimony from Miller that he understood Micro's 2010 offer to be for an Enterprise License, ECF No. 311 at 52:6–11, and admitted into evidence internal documents stating that it had reached an agreement with Micro "for a 10,000 license Enterprise agreement," and that this "enterprise license . . . can be installed up to 10,000 users on thin and thick client," ECF No. 325-27.

Express also argued more broadly that whatever licenses it purchased in 2010, they were not Workstation Licenses. Express highlighted that Micro itself equated the term Authorized User License (found in the product order form) with the "Named User License" in the EULA. ECF No. 306 at 83:7–11, 88:12–19; 89:3–12. Express also admitted into evidence vendor questionnaires from March and June of 2010 which showed Micro describing Express's "type of license" as "named user." ECF No. 325-27 at 7–8; ECF No. 325-28 at 3–4. Express was careful

8

however, in arguing to the jury that it did not aim to prove that it had purchased Named User Licenses. ECF No. 303 at 104:18–105:11. Nor was any evidence introduced to support that the parties discussed or negotiated the purchase or sale of Named User Licenses.

Rather, the only evidence at trial on this point is confined to brief testimony from a single witness, James Grant, Micro's Senior Compliance Manager who conducted the 2015 audit. Grant testified, without elaboration, that during the audit, "if" he had "bought the argument" Express had purchased Named User Licenses, then Express still would have over-deployed the software according to the EULA. ECF No. 309 at 83:9–85:11. No other testimony was elicited from any witness to suggest that the parties in fact had agreed to the purchase and sale of Named User Licenses in 2010.

At the close of the evidence, and during the charging conference, Micro objected to the jury instructions and verdict sheet as finally given, and argued that the instructions should have been more broadly worded so as to allow Micro to assert alternatively that Express agreed to and purchased Named User Licenses. ECF No. 312 at 83:21–84:2.[4] After a lengthy and exhaustive charge conference, *see generally* ECF No. 303 at 94:9–176:15, the Court overruled Micro's objection and made clear it would not permit Micro to argue in the alternative that the parties agreed to the purchase and sale of Named User Licenses in 2010, *id.* at 141:4–10; *see also id.* at 95:2–18 ("[I]f the jury says no, a Workstation License was not bought . . . then there is no meeting of the minds, and so there is no alternative contract . . . Micro, you can't stand up and say, We believed we sold Workstation Licenses, and we have proven that; alternatively, if you

---

[4] The Court immediately expressed skepticism that there was evidence to support Micro's Named User theory. ECF No. 312 at 90:7–12, 91:14–24.

believe we have sold something else, we believe that, too.").[5] The Court thus framed the instructions and companion special verdict form to align with Micro's theory of the case and the evidence presented at trial. *See, e.g.*, *id.* at 116:18–25, 117:8–17. The jury instructions made clear that the question for resolution was whether in June 2010 the parties had agreed to, and thus entered into, a contract for the purchase and sale of Workstation Licenses. ECF No. 298 at 6, 8–9.

In closing argument, Express primarily argued that it purchased a special "Enterprise License" to be used with Citrix. ECF No. 313 at 79:13–18, 80:5–25, 81:1–5, 82:13–21, 83:5–7, 85:18–19, 86:2–17, 88:4–8, 95:11–96:2, 96:14–18, 100:14–25, 102:3–13. Express also argued that the EULA is not the applicable contract for the 2010 deal. *Id.* at 86:8–12; 99:22–100:4. On a few occasions, Express referenced evidence concerning the Named User License, but only to echo that even Micro did not believe it had sold Workstation Licenses to Express. *See id.* at 89:7–90:4 ("Even Micro Focus, they didn't think that we had a Workstation License."); *id.* at 91:10–17, 97:1–11 ("That's what Micro Focus thought it was selling us when it said we could get an Enterprise License."). Never did Express suggest that the evidence could fairly lead the jury to conclude that the parties had a meeting of the minds in purchasing Named User Licenses.

The jury returned a verdict after two days deliberation. ECF No. 295. On the special verdict form, the jury answered "yes" to the first question—whether it unanimously determined that Micro and Express did "enter into a contract for the purchase of software licenses in . . . 2010[.]" *Id.* at 1. As to the next question, whether "parties agreed to buy and sell 10,000 'Workstation Licenses' as defined in the [EULA]," the jury answered "no." *Id.* Thus, as the

---

[5] Express moved for judgment as a matter of law as to the meaning of terms in the Named User License. ECF No. 312 at 73:12–21; *see* ECF No. 284. Because the jury instructions and verdict form cabined the jury's determination to whether the parties agreed to purchase and sell Workstation Licenses, the Court denied Express's motion as moot. ECF No. 303 at 176:2–9.

special verdict form directed, the jury did not reach the question of damages because it had already determined that Micro failed to carry its burden as to having sold Express Workstation Licenses. Based on this verdict, the Court entered judgment in favor of Express. ECF No. 315.

Micro now moves for a new trial, ECF No. 320, and Express moves for an award of attorneys' fees and costs, ECF No. 319. The Court will address each motion in turn.

## II. Motion for New Trial

### A. Standard of Review

Federal Rule of Civil Procedure 59(a) provides that the Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Because every litigant is entitled to one fair trial, not two, the decision of whether to grant or deny a motion for a new trial lies within the discretion of the district court." *Wallace v. Poulos*, 861 F. Supp. 2d 587, 599 (D. Md. 2012) (internal citations and quotation marks omitted); *see also King v. McMillan*, 594 F.3d 301, 314 (4th Cir. 2010). "The court must exercise its discretion to grant a new trial only if the verdict (1) is against the clear weight of the evidence, (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Wallace*, 861 F. Supp. 2d at 599 (citing *Knussman v. Maryland,* 272 F.3d 625, 639 (4th Cir. 2001)). Such a motion should be granted only when it "is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." *Pathways Psychosocial v. Town of Leonardtown*, 223 F. Supp. 2d 699, 706 (D. Md. 2002) (internal quotation marks omitted) (citations omitted).

Flawed jury instructions may constitute a proper basis to order a new trial under Rule 59. *Goodman v. Praxair Servs., Inc.*, No. MJG-04-391, 2011 WL 13176593, at *10 (D. Md. Mar. 30,

11

2011), *aff'd sub nom.*, *Goodman v. Praxair, Inc.*, 471 F. App'x 133 (4th Cir. 2012). "However, a new trial is only appropriate if the instructions were erroneous and the error 'seriously prejudiced' the moving party's case." *Id.* (quoting *Dodd v. Auto. Ins. Co. of Harford*, No. 2:05CV216, 2007 WL 1133268, at *2 (W.D.N.C. Apr. 16, 2007)); *cf. RFT Mgmt. Co. v. Powell*, 607 F. App'x 238, 243 (4th Cir. 2015) ("[W]e will not set aside a resulting verdict unless the erroneous instruction *seriously* prejudiced the challenging party's case." (emphasis in original)).

**B. Analysis**

Micro contends that it is entitled to a new trial because the Court erred in instructing the jury regarding Micro's contract theory as limited to Express's purchase of Workstation Licenses in 2010. As an initial matter, the Court finds that Micro preserved its objection to the jury instructions. Although Express notes that Micro's objection during the charge conference was lukewarm, and at times even conciliatory, ECF No. 325 at 16–17; *see, e.g.*, ECF No. 303 at 131:20–132:2; *but see id.* at 140:19–141:12, Micro thereafter timely filed written objections to the instructions and special verdict form which preserved its position. ECF No. 287; ECF No. 288; *see Just Wood Indus., Inc. v. Centex Contr. Co.*, 188 F.3d 502 (Table), No. 98-1855, 1999 WL 606859, at *2 (4th Cir. Aug. 12, 1999) (finding written opposition to jury instruction sufficient to preserve objection); *see also* Fed. R. Civ. P. 51(c)(1) ("A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection.").

Nonetheless, the Court concludes that the instructions were not erroneous. The record evidence and counsel's arguments framed for the jury that it must decide whether the parties *mutually agreed* to purchase and sale of Workstation Licenses. Accordingly, the Court instructed the jury in a manner consistent with resolving that question. Conversely, because no

12

evidence was generated from which the jury could conclude the parties *mutually* assented to transact in any other type of license, the Court overruled Micro's objection. Based on fundamental principles of contract law and a careful review of the trial record, the Court cannot conclude it erred in this respect.

It is axiomatic that jury instructions must "correctly state the law and adequately cover the issues in the case." *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1164 (4th Cir. 1986) (citing *Chavis v. Finnlines, Ltd., O/Y*, 576 F.2d 1072, 1076 (4th Cir. 1978)). Jury instructions are sufficient when, considering the whole of the record, they "adequately inform[] the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Mezu v. Morgan State Univ.*, Nos. WMN–09–2855, WMN–11–3072, 2014 WL 4187230, *1 (D. Md. Aug. 21, 2014) (internal quotation marks omitted) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir.1987)), *aff'd*, 615 F. App'x 796 (4th Cir. 2015). Conversely, the Court must not instruct the jury on a theory "unsupported by the evidence presented at trial." *Aldridge v. Balt. & Ohio R.R. Co.*, 789 F.2d 1061, 1066 (4th Cir. 1986); *see also Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007) ("[I]t is error to instruct the jury on an issue when there has been insufficient evidence presented to support a jury finding on that issue." (internal alterations omitted)).

As to Micro's breach of contract claim, neither party disputes that Micro bore the burden of demonstrating that the parties entered into a contract that Express ultimately breached. On the element of contract formation, Micro had to demonstrate "manifestation of agreement or mutual assent by the parties to the terms thereof." *Safeway Stores, Inc. v. Altman*, 296 Md. 486, 489 (1983). Often referred to as a "meeting of the minds," *Address v. Millstone*, 208 Md. App. 62, 81–82 (2012), mutual assent is not formed by the subjective beliefs of the parties, but rather by

13

the outward actions which *objectively* manifest assent to be bound. *See RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*, No. WMN-09-1668, 2014 WL 12657176, at *7 (D. Md. Mar. 6, 2014), *amended on other grounds*, No. WMN-09-1668, 2014 WL 11460462 (D. Md. May 6, 2014), *aff'd*, 609 F. App'x 731 (4th Cir. 2015); *Address*, 208 Md. App. at 81–82. "[F]ailure to agree on or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking." *Klein v. Weiss*, 284 Md. 36, 63 (1978).

As to whether a contract was formed—or whether parties came to a meeting of the minds—Micro's entire case rested on proving that Express *agreed* to purchase Workstation Licenses under the EULA. Micro exclusively maintained, and elicited evidence to support, that the only contract governing the parties was the EULA, and that Express and Micro's "minds" had "met" as to the purchase of Workstation Licenses. *See Altman*, 296 Md. at 489. Express, by contrast, not only argued that it never agreed to purchase Workstation Licenses, but also that the EULA was not the operative contract.

Critically, neither party offered affirmative evidence that they manifested mutual assent to purchase or sell Named User Licenses. To be sure, Micro elicited from Grant that "if" Express's "argument" had been "bought" during the audit that it purchased Named User Licenses, the software would still have been over-deployed. But this hypothetical "what if" does not constitute evidence sufficient from which a jury reasonably could conclude the parties in fact agreed to purchase and sell Named User Licenses. No evidence supported that contract negotiations concerned Named User Licenses, and Micro had inundated the jury with argument and evidence confined to the view that it had sold Express Workstation Licenses. To allow Micro to argue alternatively the parties had contracted for Named User Licenses would have

14

hopelessly confused the jury and risked a verdict unsupported by the evidence. Thus, the Court denied Micro's objection, and instructed the jury accordingly.

Micro now argues that the Court conflated contract interpretation with contract formation, and that it had generated sufficient evidence for a reasonable jury to conclude the parties agreed to purchase and sell "authorized user" licenses which could have meant Named User Licenses. ECF No. 320-1 at 19–20. But no evidence supports that Micro communicated to Express, or Express ever understood, "authorized user" to mean "Named User" in the EULA. Rather, the record evidence at best highlighted Micro's internal communications were confused in this regard.

More fundamentally, because Express contested that the EULA was the governing contract, the jury first had to reach whether the parties *formed a contract at all* and if so, whether it was the EULA. The instructions and verdict form allowed the jury to reach the question of contract formation without presupposing the contract formed was the EULA. The next question, whether the contract was for Workstation Licenses, could only be answered "yes" if the jury had concluded the contract formed was the EULA and interpreted the parties' course of conduct to mean that Express purchased Workstation Licenses. By contrast, the second question, as framed, allowed the jury to answer "no" if it determined the contract formed was not the EULA and thus was not for the purchase and sale of Workstation Licenses. The jury's verdict thus allowed them to reach both contract formation and interpretation cleanly.

For the same reason, the Court rejects Micro's argument that because the jury answered "yes" to the first question but "no" as to the second, the jury must have determined that the parties agreed to another EULA-defined license type such as Named User. ECF No. 320-1 at 16 n.6, 19–21. This conclusion is simply not supported by the record evidence. Because Express

always maintained the EULA was not the operative contract, and instead that the parties had negotiated a contract for the purchase and sale of "Enterprise Licenses" as reflected in the product and purchase order forms, the jury's answers remain entirely consistent with the evidence generated at trial.

Finally, the Court disagrees with Micro that Express argued to the jury in closing it had purchased Named User Licenses as defined in the EULA, and thus gained unfair advantage. ECF No. 320-1 at 23–25. As Micro itself acknowledged at the charge conference, Express is permitted to contest Micro's Workstation theory by highlighting inconsistencies in Micro's own employees' representations and conduct during the parties' business relationship. ECF No. 303 at 101:24–102:16. Express's trial strategy in this respect was to underscore that "[e]ven Micro Focus . . . didn't think that [Express] had a Workstation License." ECF No. 313 at 89:7–90:4. This argument, however, is a far cry from maintaining the parties had *mutually* assented to the purchase and sale of Named User licenses. No such argument was made because no such evidence was generated to support it.

At bottom, Micro seemingly takes umbrage that the Court did not give an instruction vague enough to allow them to front a legally and factually untenable argument in closing: that even if Micro thought it sold Workstation Licenses and Express thought it bought Named User licenses—which would mean no mutual assent and thus no contract had been formed—the jury could still conclude Express breached a nonexistent contract and should thus pay damages as a result. The Court discerns no error in crafting instructions that avoided the risk of a legally unsupportable verdict on the contract claim. Micro's motion for new trial is denied.[6]

---

[6] Micro also contends that the Court erred in its ruling on a discovery matter as well as excluding evidence regarding the proper calculation of damages. ECF No. 320-1 at 25–29. Micro does not maintain that these errors independently warrant a new trial. *See id.* Rather, Micro maintains that if it prevails on the issue of instructional

## IV. Motion for Attorneys' Fees and Costs

The Court next turns to Express's motion, which is perhaps best understood as a notice of Express's intent to file a motion for attorneys' fees. ECF No. 319. Express notes for the Court that although it intends seek an award for attorneys' fees, it has not yet submitted its memorandum in support because Micro's motion for a new trial and potential appeal may affect the final resolution of such motion. *Id.* at 1–2. Express requests that the Court set a briefing scheduling for its motion following resolution of Micro's request for a new trial. *Id.* at 2.

Accordingly, the Court will stay the attorneys' fees motion and order that Express file its memorandum in support fourteen days after either (1) the issuance of the mandate from the United States Court of Appeals for the Fourth Circuit affirming the judgment, or (2) if Micro does not notice an appeal, the last date Micro could have noticed an appeal under Federal Rule of Appellate Procedure 4. In the event the judgment is vacated on appeal, the Court will deny the motion as moot at that juncture. All other response and reply dates to the attorneys' fees motion shall comport with the Federal Rules of Civil Procedure.

## V. Conclusion

For the foregoing reasons, the Court denies Micro's motion for a new trial and stays Express's motion for attorneys' fees. A separate Order follows.

| \_\_1/21/2020_____ | _____/S/_____ |
|---|---|
| Date | Paula Xinis<br>United States District Judge |

---

error, that the Court reconsider these rulings in anticipation of a new trial. ECF No. 328 at 15–16. Because this Court declines to grant Micro a new trial, it will not reach these arguments.